**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| SolarCity Corporation, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 15-13406 (RGS) |
| Seaboard Solar Operations, LLC; Stuart Longman; and Doe 1 and Doe 2, | ) ) ) | |
| Defendants. | ) ) | |

**FIRST AMENDED COMPLAINT**

Plaintiff SolarCity Corporation ("**SolarCity**") alleges as follows in support of its claims against Defendants Seaboard Solar Operations, LLC ("**Seaboard**"), Stuart Longman ("**Longman**"), and Doe 1 and Doe 2 ("**Doe**"):

**INTRODUCTION**

1.    This is an action at law and in equity for breach of contract, fraudulent inducement, breach of the covenant of good faith and fair dealing, unjust enrichment, conversion, deceptive business practices under Massachusetts General Laws Chapter 93A, and declaratory relief.

2.    The claims stem from Seaboard's and Longman's actions and breaches relating to a certain Solar Purchase and Installation Agreement ("**Installation Agreement**") that required Seaboard to perform the work necessary to engineer, procure, and construct solar power systems at seven sites in Massachusetts.  The total contract value was approximately $45 million and the seven sites were to have a total capacity of about 18,000 kilowatts.  The contract required Seaboard to meet specific deadlines for each stage of the work at each of the seven sites.

3.    Seaboard constructed one project site late and failed to construct and complete the remaining six project sites, failed to meet numerous project deadlines, and dissipated and converted millions of dollars from SolarCity, including about $6.8 million worth of solar panels and equipment that SolarCity had supplied for use on the projects.

4.    SolarCity tried to work with Seaboard to correct Seaboard's breaches.  These efforts

were unsuccessful, including because Seaboard asserted a frivolous claim of default by SolarCity and claimed that the Installation Agreement was terminated as a result.  After further efforts by SolarCity failed to resolve the disputes between the parties, SolarCity sent Seaboard notices of default in July and August 2014, directing Seaboard to cure the defaults, accelerate the work, and submit a Recovery Plan.[1]  Seaboard responded by committing more breaches, including by failing to accelerate the work and to submit a Recovery Plan and by missing more contract deadlines for all six remaining projects.  Between July 2014 and December 31, 2014, Seaboard missed every contract deadline, including the final December 31 deadline to avoid liquidated damages.  Seaboard abandoned work on the projects.

5.    When SolarCity gave Seaboard notice of its defaults in July 2014, SolarCity had already paid over to Seaboard about $16 million under the Installation Agreement, which included approximately $6.8 million worth of solar equipment to be used on the projects.

6.    The payment schedule in the Installation Agreement was structured such that Seaboard received large payments for early milestones in order to provide the money to pay for the equipment and labor needed for later milestones.  Rather than use those funds and equipment for Installation Agreement work and equipment, however, Seaboard and Longman dissipated and converted substantial amounts of them and concealed their conversion from SolarCity, including by ignoring SolarCity's demands to provide accountings of the use of the funds and equipment and to return SolarCity's solar equipment.

7.    In 2015, Longman told SolarCity that he had used SolarCity's solar equipment on other projects unrelated to the Installation Agreement.   Longman did not identify for which of his other entities or projects he used SolarCity's solar equipment, or to which he diverted funds that were supposed to be used to perform work under the Installation Agreement.  Accordingly, these other entities, which, on information and belief are related to Longman, are identified as

---

[1]Terms that are not defined in this filing have the meanings assigned to them in the Installation Agreement.

Doe 1 and Doe 2.

8.    Between July 2014 and early 2015, SolarCity pursued efforts to resolve the disputes with Seaboard and efforts to work directly with Seaboard's subcontractor to complete the work. None of those efforts succeeded.

9.    Complicating SolarCity's efforts was the impending expiration of substantial government credits to SolarCity that were integral to the economics of the projects.   These credits, called Solar Renewable Energy Credits ("**SREC**"), could be earned by SolarCity only if the projects under the Installation Agreement were operational by February 2015.   Because of Seaboard's failures under the Installation Agreement, that completion date could not be met.

10.   Given the unresolved problems with Seaboard, SolarCity approached the Massachusetts Department of Energy Resources to obtain extensions of the SREC credits.   After significant efforts, which included explaining the difficulties being experienced with Seaboard, the agency extended the SREC credits such that they would be paid if the projects were completed in September 2015.

11.   After obtaining the extension, SolarCity continued efforts to resolve the disputes with Seaboard but without success.

12.   It became apparent to SolarCity that Seaboard was not interested in resolving the disputes or completing the work under the Installation Agreement and that Seaboard and Longman had converted the money and equipment that SolarCity had provided.

13.   Confirming SolarCity's determination in this regard was SolarCity's discovery that Longman, whom SolarCity understands to be Seaboard's controlling principal, had through various shell entities of which he was also the sole or controlling member, engaged in extensive and serial frauds in other development projects.   The fact that Longman and his shell-entities had engaged in these fraudulent and wrongful actions has been determined by multiple court judgments, court opinions, and arbitral awards issued in state and federal courts and in AAA arbitrations in Connecticut, New York, and South Carolina.   SolarCity only recently became aware of the extensive adverse findings against Longman and his shell entities.   The findings

include that Longman committed fraud, engaged in "gross, wanton[], and willful" misconduct, diverted and misappropriated funds, and engaged in a pattern of abusive litigation against his business partner when that partner sought to enforce his rights against Longman.  Several court decisions and other findings of business and litigation misconduct by Longman and shell-entities that he controlled are set forth in more detail in Paragraph 72.

## PARTIES

14.  SolarCity is a Delaware corporation with a principal place of business in California. SolarCity develops and manages solar energy systems for homeowners, businesses, and government organizations.

15.  Defendant Stuart Longman is a Connecticut resident, domiciled in Connecticut. Longman signed the Installation Agreement for Seaboard as its manager on April 7, 2014.

16.  Defendant Seaboard Solar Operations, LLC ("**Seaboard**"), is a Connecticut limited liability company with a principal place of business in Connecticut.  A true and correct copy of Seaboard's Articles of Organization is attached as Exhibit 1.  True and correct copies of Seaboard's 2012, 2013 and 2014 Annual Reports are attached as Exhibit 2.  On information and belief, Longman is the controlling principal of Seaboard.

17.  Defendants Doe 1 and Doe 2 are persons and/or entities that received SolarCity's solar equipment and funds that were intended for use on the seven project sites under the Installation Agreement until Longman diverted and converted that equipment and those funds for his own benefit and the benefit of one or more currently-unknown parties.  On information and belief, Doe 1 and Doe 2 are liable to SolarCity in this action, but their identities are currently unknown and within Longman's knowledge.  SolarCity will amend its pleadings to add the identities of these persons and/or entities to the extent that SolarCity is able to do so through discovery in this action.

## JURISDICTION AND VENUE

18.   This Court has subject matter jurisdiction under 28 U.S.C. §1332 because SolarCity is a citizen of different states than Seaboard and Longman and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19.   This Court has personal jurisdiction over SolarCity, Seaboard, and Longman because they all have been doing business in Massachusetts and the seven solar projects at issue are in Massachusetts.

20.   Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(2).  Venue is proper in this district under Local Rule 40.1(D)(2) and because the parties agreed in the Installation Agreement at Exhibit 6, §5.15, that disputes are subject to the exclusive jurisdiction of the U.S. District Court in Boston, Massachusetts.

21.   Massachusetts law governs this dispute as provided in the Installation Agreement at Exhibit 6, Section 5.15.

22.   Declaratory relief is authorized by 28 U.S.C. §2201 because this case involves an actual controversy and is brought, in part, under Rule 57 of the Federal Rules of Civil Procedure to determine the parties' respective rights, obligations, and liabilities under the Installation Agreement.

23.   This Court has pendent jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

## FACTS

### A.      Project Background

24.   In April 2014, Solar City and Seaboard (jointly, the "**Parties**") entered into the Installation Agreement, a true and accurate copy of which is attached as Exhibit 3.

25.   Seaboard is a special purpose entity formed for the sole purpose of performing the Installation Agreement and has no source of income other than that contract.

26.   The Installation Agreement required Seaboard to permit, design, procure, construct, and install solar systems on seven projects in Massachusetts.   The Installation Agreement

(Exhibit 6, Section 1.1), defines those responsibilities as the "**Work**."

27.  On page 1 of the Installation Agreement, Seaboard represented that it had "extensive expertise with respect to the design and installation of solar power systems" and SolarCity stated that it had retained Seaboard specifically "to permit, design, procure, construct and commission the solar power systems" described in that agreement.

28.  When SolarCity made the decision to enter into the Installation Agreement, it also relied on Seaboard's representations in Exhibit 6 at Section 4.11(e) of that agreement that Seaboard was "experienced and fully capable of performing under and fulfilling the requirements of this Agreement."

29.  Exhibit 5 of the Installation Agreement identified the following seven Installation Sites for solar systems in Massachusetts (each a "**Site**" and, collectively, the "**Sites**"), each of which is described in more detail in Exhibits 5.1 through 5.7 of the Installation Agreement:

(1)   100 Adams Road, Clinton
(2)   111 Adams Road, Clinton
(3)   100 Simplex Drive, Westminster
(4)   788 Wood Street, Swansea
(5)   38 Gilbertsville Road, Ware
(6)   50 Gilbertsville Road, West Brookfield
(7)   17 Joe Jenny Road, Oxford

30.  Seaboard Solar Holdings, LLC, an affiliate of Defendant Seaboard, sold each Site to SolarCity in an Asset Sale and Purchase Agreement (each a "**Purchase Agreement**").

31.  The terms of each Purchase Agreement are substantially the same, except that each applies to a different Site, with its own price, address, kilowatt capacity, and type of facility (*e.g.,* ground-mounted, roof-mounted).

32.  SolarCity is the lessee on a ground lease with Seaboard, which is the owner of one of the seven Sites.  On the remaining six Sites, SolarCity is the lessee on ground leases with third party lessors.  The Sites consist of land or buildings with available ground or roof-space on which the solar systems were to be installed.

33.  In Exhibit 6 at Section 5.1(b) of the Installation Agreement, SolarCity granted

Seaboard a license to enter the Sites to perform the Work.

34.  The necessary Work varied depending on the Site.  For example, site preparation could include tree removal, storm water basin construction, construction of structures to hold solar equipment either as ground mounts or as roof mounts on existing buildings, and the installation of equipment to interconnect with the power grid.

35.  Seaboard contracted directly with Prime Solutions, Inc. ("**Prime**") for Prime to serve as the general contractor under Seaboard's direction to perform the Work.

36.  SolarCity is not a party to the contract between Seaboard and Prime.

37.  SolarCity requested that Seaboard provide SolarCity with a copy of the Prime contact.  Seaboard has never done so.

**B.     Installation Agreement:  The Project Schedule for Each Site**

38.  The Installation Agreement has a detailed Schedule for each project in Exhibit 4. That Schedule is referenced in the Installation Agreement at Exhibit 6, Section 1.1.

39.  Exhibits 4.1 through 4.7 are specific Schedules for each of the seven Sites.

40.  The Installation Agreement required Seaboard to perform the Work on each Project in stages.  The deadlines for each stage are set forth in Exhibits 4.1 through 4.7.  The Work was staged with these deadlines in order to ensure that design, procurement, and installation tasks on all the Sites were timely performed.  The Site Schedule identified the following work activities for each Site:

> Engineering and Design Process Begins,
> Building Permit Obtained,
> Commencement of Construction,
> Mechanical Completion Date,
> Interconnection Date,
> Commissioning Complete Date, and
> Substantial Completion/PTO Date (Permission To Operate)

41.  The Installation Agreement required Seaboard to meet each of the seven site-specific Schedule deadlines set forth in Exhibits 4.1 through 4.7.

42.  Exhibit 2 of the Installation Agreement is titled "Scope of Work" and identifies

Seaboard's responsibilities, including the following in Section 1(k) regarding Seaboard's obligation to commence work:

> [Seaboard] shall commence the performance of its work with respect to each System (including the related Site) on the next business day following the effective date of this Agreement [*e.g.*, April 10, 2014]. [Seaboard] shall execute and deliver all further instruments and documents, and take all further action, that may be necessary . . . in order to enable [Seaboard] to complete performance of [Seaboard]'s work hereunder or to effect the purposes or intent of this Agreement.

43. The Installation Agreement defined the "**Work**" as follows, in Exhibit 6, Section 3.1(a):

> The Work… [Seaboard] will perform and provide all permitting, design, engineering, construction supervision, inspection, labor, materials, tools, construction equipment and subcontracted items necessary for the construction and installation of the System, all as further set forth in this Agreement (collectively, the "**Work**").

44. The Installation Agreement stated the following in Exhibit 6, Section 1.1, regarding the Work and the Schedule deadlines:

> The Work shall be performed in accordance with Prudent Industry Practices, the other terms of this Agreement, applicable laws and all project plans, drawings, project specifications and other contract documents attached to or incorporated into this Agreement ("**Contract Documents**"). . . . The agreed construction schedule (the "**Schedule**") is set forth as __Exhibit 4__.

45. Regarding Seaboard's obligation to meet the Schedule deadlines in Exhibit 4, the Installation Agreement stated as follows in Exhibit 6, Section 3.1(b):

> Progress Schedule. [Seaboard] **shall** complete the Work in accordance with the schedule for each System (including each Site) set forth in __Exhibit 4__, as applicable. [Subject to any Force Majeure, __**Seaboard] guarantees**__ that the Substantial Completion Date for each System **shall** occur prior to or on the Guaranteed Substantial Completion Date for each such System set forth in __Exhibit 4__ as applicable. [Emphasis added]

46. For easy reference, SolarCity created a summary table that accurately depicts on one page for all seven Sites the Schedule deadlines from Exhibits 4.1 through 4.7, compared with the dates Seaboard actually completed the activity, if at all. That table is referred to herein as the "**Schedule Table**", a copy of which is attached to the Complaint as __Exhibit 4__, and incorporated here by reference.

47. Completion of the work by each date in each Schedule was important to ensure that

each Site was timely designed, constructed, and completed.

48.   Timely completion of all the Sites was important in order for SolarCity to earn the SREC credits, which are incentive credits that are integral to the economics of the projects, provided the Sites were operational by February 2015.   The credits had been awarded to SolarCity by the Massachusetts Department of Energy Resources, totaling in excess of $10 million for all seven Projects.

49.   In the Installation Agreement at Exhibit 6, Section 3.1(b), Seaboard contracted to pay liquidated damages for any failure "to comply with the Schedule".

**C.     SolarCity's Payments to Seaboard Under the Installation Agreement**

50.   The contract price Seaboard was to receive for the Work was based on the installed-wattage for each Site, as set forth in the Installation Agreement in Exhibits 1.1 through 1.7.

51.   For example, as set forth in Exhibit 1.1 for the System at 100 Adams Road in Clinton, Massachusetts, the contract price was $2.3981/Watt-DC installed and the system size 2,685,980 watts, making the contract price approximately $6.4 million.

52.   The total contract price for all seven projects was in excess of $40 million.

53.   The Installation Agreement had a Payment Schedule at Exhibit 6, Section 5.4.   It provided the following percentage payments for the following work on each Site:

Payment 1:   10% of the contract price for each System upon Closing
Payment 2:   30% upon receipt of all Required permits
Payment 3:   30% upon delivery of all Major Equipment to the Site (photo-voltaic modules, inverters, and racking)
Payment 4:   20% upon achievement of Substantial Completion
Payment 5:   10% upon the PTO or the Commissioning Completion Date

54.   The Payment Schedule required SolarCity to pay Seaboard substantial amounts of money well before the Sites were to achieve Substantial Completion, including, for example, 40% of the total contract price upon receipt of the required permits and 70% upon the delivery of Major Equipment.

55.   A purpose for the timing of these large payments before the Substantial Completion

deadlines was to provide money to buy equipment and pay the labor cost of the work.

56. SolarCity provided to Seaboard approximately $16 million under the Installation Agreement, which amount includes approximately $6.8 million in solar equipment to be used on the Sites.

**D. SolarCity's Notices of Breach to Seaboard for Its Failures to Meet Deadlines, Effect Cures, Provide a Recovery Plan, and Provide Further Assurances**

57. Seaboard's failures to meet its obligations under the Installation Agreement began almost immediately after that contract was signed in April 2014. *See* Schedule Table, Exhibit 4.

58. In communications with SolarCity, including in early May and June 2014, Seaboard admitted that it had missed Schedule deadlines and asked for lengthy extensions to all the Schedule deadlines, none of which SolarCity granted. The extensions Seaboard sought included deadlines for Substantial Completion/PTO (which stands for "Permission To Operate") that extended past the contract deadlines by up to four months.

59. SolarCity did not agree to these extensions, including because Seaboard failed to provide basic information about such things as its ability to meet its procurement obligations and had become unresponsive and uncooperative in its interactions with SolarCity.

60. By letter dated July 15, 2014, SolarCity gave notice to Seaboard under Exhibit 6, Section 5.10(a) of the Installation Agreement that Seaboard was in breach. A true and accurate copy of SolarCity's July 15, 2014 Letter to Seaboard is attached as Exhibit 5 and incorporated here by reference (the "**July Notice**").

61. The July 15 Notice stated, among other things, that, if Seaboard failed to cure, accelerate the work, and submit a Recovery Plan to recover the Schedule, SolarCity would exercise its right to terminate the Installation Agreement and assume the Work. The notice identified specific Schedule breaches that Seaboard had committed as of July 15 and facts regarding those breaches. It also requested further assurances from Seaboard regarding performance of its obligations under the contract, noting that Seaboard had failed to provide such assurances despite having been requested to do so multiple times in May and June. Seaboard

was required to provide these assurances, including under Exhibit 6, Sections 1.1 and 5.18(h) of the Installation Agreement.

62.   By letter dated August 6, 2014, SolarCity sent a second notice of breach to Seaboard for, among other things, Seaboard's failure to meet additional Schedule deadlines.  This notice identified Seaboard's continuing failures to provide economic and schedule assurances, to cure its defaults, to provide cash flow accountings for all the Projects, and to submit a Recovery Plan. A true and correct copy of the August 6 notice letter is attached as Exhibit 6 and incorporated here by reference (the "**August Notice**").

63.   Seaboard failed to cure the breaches, to accelerate the Work, to provide a Recovery Plan, or to provide further assurances.

64.   Throughout the rest of 2014, Seaboard ceased significant work on the Sites and defaulted on its remaining performance obligations under the Installation Agreement, including by missing the remaining Schedule deadlines in Exhibits 4.1 through 4.7 and as reflected in the Schedule Table attached to this complaint as Exhibit 4.

65.  As of the filing of this Complaint, six of the seven sites remain essentially abandoned by Seaboard with no significant work having been performed on them in many months.

**E.**      **Seaboard's Breach by Failure to Remove Lien and Repay SolarCity**

66.   By letter dated August 21, 2014, the third party landlord from whom SolarCity leases the 100 Simplex Site in Westminster, Massachusetts, received notice of a mechanic's lien in the amount of $205,525.58 for work by employees of a subcontractor of Prime concerning the installation of a solar system on the 100 Simplex Site.

67.   By notice letter dated September 18, 2014, the lessor demanded that SolarCity remove the lien or be held responsible for that liability and all attendant costs and fees.

68.   On September 26, 2014, SolarCity paid that lien in full.

69.   By letter to Seaboard dated October 3, 2014, SolarCity notified Seaboard of the lien,

of the lessor's demand that SolarCity pay it, and of SolarCity's payment.  This October 3 notice letter noted Seaboard's liability for the lien under the Installation Agreement (Exhibit 6, Section 5.8), which provides that this amount "shall be immediately due and payable" by Seaboard to SolarCity.  A true and correct copy of SolarCity's October 3, 2014 notice to Seaboard is attached as <u>Exhibit 7</u>.

70.  Seaboard has failed to repay SolarCity for that lien.

**F.      SolarCity's Termination of the Installation Agreement; Longman's Substantial History of Misconduct and Abuse of Judicial Proceedings**

71.  During the Fall of 2014 and into 2015, SolarCity made efforts to negotiate a resolution of the disputes regarding Seaboard's breaches with Seaboard.  These efforts included communications with Seaboard and Prime for more than twenty days starting in August 2014, in compliance with the negotiations period provided in the Installation Agreement, Exhibit 5 at Section 5.15.  These efforts also included negotiations with Seaboard in the Spring of 2015.  No resolution resulted.

72.  SolarCity's decision to cease efforts to work out a mutual resolution with Seaboard and Longman was based on the lack of progress in those efforts and because SolarCity learned for the first time in 2015 that Longman had a long history of failed business deals.  In fact, numerous courts and arbitration panels have entered judgments and awards against Longman and shell entities that he created and controlled, and have made troubling findings regarding Longman's and his shell-entities' concealment of information, diversion of assets, self-dealing, and abuse of judicial processes in order to prevent enforcement of lawful judgments against him.  Several such matters and findings are briefly described below:

a)    In 1996, after trial in New York, the court entered judgment against Longman for more than $1.2 million in actual damages and $2.7 million in punitive damages after finding that Longman had defrauded his business partner by secretly obtaining a mortgage, converting the mortgage proceeds for his own purposes, and concealing these actions from his business partner (Robert McKay). The court found Longman liable for actual fraud, based, among other things, on explicit findings that Longman engaged in **"affirmative fraud," "fraud by concealment,"** and **"gross, wanton[], and willful"**

misconduct.  Judgment, *McKay et al. v. Stuart Longman et al.,* No. 6253-90, (N.Y. Sup. Ct. (Albany) July 10, 1996).

b)    In October 2005, an AAA arbitration panel entered an award against Longman and a Longman-controlled shell entity of which he was the sole manager (Emerald Investments LLC) for wrongful diversion of funds for personal gain, failure to disclose material information, and other acts that defrauded his business partner.  *Kriti Ripley LLC et al. v. Emerald Investments LLC and Stuart Longman,* 404 S.C. 367, 372-373 (Aug. 8, 2013) (reciting AAA and litigation history).  A New York court confirmed this AAA award in 2006.  *Id.* at 373.

c)    In 2010, after Longman evaded paying McKay any amounts on the 1996 judgment -- noted above in paragraph 72(a) – for fourteen years, McKay filed suit in Connecticut to enforce the judgment and to pierce the veil of twenty shell-entities that Longman had created -- and which he controlled -- in order to evade creditors.  As of the filing of that complaint, Longman owed McKay over $9 million.  *McKay v. Stuart Longman individually and as trustee of the Longman Family Trust et al.,* No. FSTX 08-CV-106007056S, 2012 Conn. Super. LEXIS 2924 (Conn. Super. Nov. 30, 2012).

d)    In 2013, the South Carolina Supreme Court affirmed South Carolina trial court findings that "Emerald and its sole member, Stuart Longman, diverted and misappropriated" funds of his business partner totaling about $1.25 million.  *Kriti Ripley,* 404 S.C. at 369.  The court also found that, after the plaintiff had obtained a judgment, Longman and Emerald "refused to pay any amount towards the judgment and instead have engaged in a pattern of abusive litigation." *Id.*

e)    In 2013, Judgment also was entered against Longman – and another single purpose shell entity of which he was the sole member ("Solaire") – in *Sharp Electronics Co. v. Solaire Development and Stuart Longman*, No. DBD-CV-105008729, 2013 WL 6697931 (Conn. Super. (Danbury) Nov. 22, 2013).  There, the court found after trial that Longman had signed contracts with Sharp Electronics for the delivery of 2,537 solar units, that he had paid only $200,000 of the amount due, and that he had failed to pay the balance due of $1,334,000.  The trial court's finding of breach of contract by Solaire and breach of personal guarantees by Longman were affirmed on appeal in 2015.

f)    In 2015, a bankruptcy court appointed a trustee to take control of Longman's assets due to Longman's conduct, including bad faith, "ulterior motive", and nondisclosure of property in the possession of other Longman-related shell entities.  *In re Emerald Investments, LLC,* Nos. 14-13406 & 14-13407 (MG), 2015 Bankr. LEXIS 1008, *31, slip op., (Bankr. S.D.N.Y. Mar. 31, 2015) ("March 2015 Decision").

g)    In 2015, another court dismissed a bankruptcy suit filed by Longman and a Longman-controlled shell entity (Sapphire) as a sanction for making a bad faith filing (and other misconduct) in order to avoid legitimate efforts by McKay (see above) to enforce collection of his New York judgment.  *In re*

*Sapphire Dev., LLC,* No. 13-50043, 2015 Bankr. LEXIS 2100 (Bankr. D. Conn. June 26, 2015).  In this decision, the court described, in part, the long history of misconduct by Longman and entities he controlled.  *Id.*

h)   In 2015, another bankruptcy court entered findings and an order against Longman and shell-entities that he controlled after making findings about his long history of business and litigation misconduct.  Memorandum Opinion and Order Granting (I) Motion For Approval of Sale Procedures, and (II) Application To Retain Broker, *In re Emerald Investments, LLC*, No. 14-13407 (MG) (Bankr. S.D.N.Y. July 10, 2015) (Dkt. 77) at pp. 6-8.

73.   In September 2013, the Bankruptcy Court in Connecticut stated the following about Longman and his manipulation of another of his shell-entities (Sapphire) and his abuse of bankruptcy court proceedings:

[D]istilled to its pungent essence, the debtor [Sapphire] and Longman are attempting to lock McKay out of this court and the state court in an effort to avoid paying a judgment Longman owes to McKay for Longman's affirmative fraud.

*In re Sapphire Development, LLC*, No. 13-50043, 2013 Bankr. LEXIS 5706, at *12 (Bankr. D. Conn. Sept. 30, 2013) (rejecting that effort by Longman and Sapphire).

74.   In March 2015, the Bankruptcy Court in the Southern District of New York stated the following about Longman and his actions regarding the shell entity (Emerald) involved in that litigation:

Clearly, Longman, as the principal member and manager of Emerald, controlled and dominated Emerald . . . .  He admittedly failed to observe the corporate formalities of these entities by taking money deposited [by his partner in the development venture] as capital . . ., and putting it to personal use in accounts he controlled of other entities.  He also diverted loan funds intended to pay suppliers, as well . . . .   Under these facts, Longman was the puppeteer pulling the strings of Emerald for his own advantage and to the detriment of [his partner in the business] and can be held accountable for his actions as the alter ego of Emerald.

March 2015 Decision at *8.

75.   The above-referenced matters were pending at different stages of litigation when Seaboard and Longman signed the Installation Agreement in April 2014.

76.   Seaboard concealed these litigation matters from SolarCity despite a representation and warranty provision in the Installation Agreement that required their disclosure.  Specifically, in Exhibit 6, Section 4.11(c), of the Installation Agreement, Seaboard, through Longman,

representing himself in the Installation Agreement as Seaboard's manager, represented and warranted as follows:

> No suit, claim, action, arbitration, or legal, administrative or other proceeding is pending or, to the best of Seller's [e.g., Seaboard] knowledge, threatened that would affect the . . . ability of Seller to fulfill its commitments hereunder in any material respect, or that could result in any material adverse change in the business or financial condition of Seller.

77.    Had SolarCity known of these litigation matters against Longman and his shell entities, SolarCity would not have entered into the Installation Agreement.

**G.      SolarCity Exercises its Step-In Rights.**

78.    On September 21, 2015, SolarCity sent Seaboard a notice letter pursuant to the Installation Agreement (Exhibit 6, Section 5.10), formally terminating the Installation Agreement and notifying Seaboard that SolarCity was exercising its step-in rights.  The notice withdrew Seaboard's license to access the Sites (under Exhibit 6, Section 5.1(b)), and required Seaboard to withdraw from the Sites, assign to SolarCity all relevant documents necessary for the work (*e.g.*, contracts, purchase orders and permits regarding all Sites), provide SolarCity with any information, drawings, specifications, and documents concerning the Sites, and to deliver possession to SolarCity of all equipment at the Sites, all in order to enable SolarCity to attempt to complete the Work and mitigate the costs of doing so.  A true and correct copy of that notice letter is attached hereto as Exhibit 8.

79.    Seaboard is liable for SolarCity's damages in the form of the agreed liquidated damages and/or the cost of completion of the work under the Installation Agreement (Exhibit 6, Section 5.10), including contractual and statutory attorneys' fees.

**COUNT I**
**Breach of Contract -- Seaboard**

80.    SolarCity incorporates here by reference all prior paragraphs of the Complaint.

81.    The Installation Agreement between SolarCity and Seaboard is a valid and

enforceable contract, supported by valid consideration.

82. SolarCity performed its obligations under the Installation Agreement and is not in material breach of that agreement.

83. Seaboard breached the Installation Agreement, including by failing to meet the Schedule deadlines, provide further assurances, cure its breaches, accelerate the Work, deliver to SolarCity a Recovery Plan, account for Seaboard's use of the monies it has received from SolarCity under the Installation Agreement, and failing to repay SolarCity for the $205,525 lien.

84. As a result of Seaboard's breaches, SolarCity has been harmed and will suffer further damages and harm.

85. SolarCity seeks performance by Seaboard of its post-termination obligations under the Installation Agreement, including to cooperate with SolarCity and provide documents and equipment as required in Exhibit 6, Section 5.10.

## COUNT II
## Breach of Contract -- Seaboard

86. SolarCity incorporates here by reference all prior paragraphs of the Complaint.

87. The Installation Agreement at Exhibit 6, Section 4.11(c), which agreement was signed for Seaboard by Stuart Longman as its manager on April 7, 2014, contains the following Representation and Warranty:

> No suit, claim, action, arbitration, or legal, administrative or other proceeding is pending or, to the best of [Seaboard's] knowledge, threatened that would affect the . . . ability of [Seaboard] to fulfill its commitments hereunder in any material respect, or that could result in any material adverse change in the business or financial condition of Seaboard.

88. As of April 7, 2014 when Seaboard signed the Installation Agreement, suits, claims, actions, and other proceedings were pending against Longman and various Longman-created shell entities, including the *Kriti Ripley, McKay,* and *Sharp Electronics* matters identified above in Paragraph 72 of this complaint, which threatened or could result in material adverse changes to the business or financial condition of Seaboard or Longman (the "**Related Party Actions**").

89.  By failing to disclose the Related Party Actions, Seaboard breached the Installation Agreement.

90.  Seaboard's breach was deliberate and willful.

91.  As a result of Seaboard's breaches, SolarCity has been harmed and will suffer further damages and harm.

## COUNT III
## Fraud in the Inducement -- Seaboard and Longman

92.  SolarCity incorporates here by reference all prior paragraphs of the Complaint.

93.  On April 7, 2014, Seaboard and Longman knew about the existence of the Related Party Actions, and knew that their representations in Section 4.11(c) of the Installation Agreement were untrue.

94.  Seaboard and Longman intentionally misrepresented and/or concealed and failed to disclose to SolarCity the Related Party Actions in negotiating the Installation Agreement.

95.  Seaboard and Longman intended for SolarCity to rely on their intentional misrepresentations and/or concealment and failure to disclose the Related Party Actions.

96.  Seaboard's and Longman's misrepresentations and failures to disclose the Related Party Actions were false and deceptive when made, were made prior to and upon entering into the Installation Agreement, and were made to induce SolarCity to enter into that agreement.

97.  SolarCity, themselves unaware of the Related Party Actions, entered into the Installation Agreement in reasonable reliance on Seaboard's and Longman's representations and warranties in the Installation Agreement, including in Section 4.11(c).

98.  As a result of Seaboard's and Longman's fraudulent inducement, SolarCity was harmed and suffered damages due to Seaboard's and Longman's concealment, nondisclosure, fraud, misrepresentation, and breach of the representations and warranties.

## COUNT IV
## Breach of the Implied Covenant of Good Faith and Fair Dealing -- Seaboard

99. SolarCity incorporates here by reference all prior paragraphs of the Complaint.

100. At all relevant times, the Installation Agreement was a valid and enforceable contract between SolarCity and Seaboard.

101. Implied in every contract, including the Installation Agreement, is a covenant of good faith and fair dealing, which requires that neither party do anything that will deprive the other of the fruits of the contract.

102. Seaboard's misconduct, including as described above, breached the Installation Agreement and has deprived SolarCity of the fruits of the Installation Agreement.

103. Seaboard also breached the Installation Agreement and the covenant of good faith and fair dealing including by concealing the Related Party Actions, by converting funds and solar equipment, by abandoning the work, by wrongly denying its breaches, asserting in bad faith that SolarCity was in breach, and by raising frivolous claims of rescission and breach by SolarCity.

104. By all these actions, Seaboard sought to deprive SolarCity of its rights and benefits under the Installation Agreement.

105. As a direct, foreseeable, and proximate result of Seaboard's breach, SolarCity has suffered damages and will continue to suffer harm and damages.

## COUNT V
## Unjust Enrichment -- All Defendants

106. SolarCity incorporates here by reference all prior paragraphs of the Complaint.

107. SolarCity performed under the Installation Agreement by, among other things, providing Seaboard and Longman with solar equipment and money that were to be used to pay for labor and equipment for the engineering, procurement, and construction of solar energy facilities on the Sites.

108. To date, SolarCity has paid over to Defendants Seaboard and Longman approximately $16 million in cash and solar equipment under the Installation Agreement and has

not received in return the work, equipment (including solar panels, inverters, and/or racking) or progress on the Sites required by the Installation Agreement.

109. SolarCity also has not received from Defendants, despite requests, an adequate accounting, by Site, of the uses to which Defendants put the $16 million that SolarCity has paid.

110. On information and belief, Defendants have received and improperly kept for themselves and their own benefit monies and/or equipment that were to be used to fulfill the requirements of the Installation Agreement and were to be returned to SolarCity upon termination of the Work.

111. On information and belief, Defendants Doe 1 and Doe 2 have improperly received and kept part or all of the amounts and equipment that Defendants Seaboard and Longman took from SolarCity and knew, or should have known, that they had no right to receive or entitlement to keep those proceeds.

112. In addition, Defendants Seaboard and Longman have been unjustly enriched by the $205,525.58 that SolarCity paid to remove the lien as discussed above, and which the Installation Agreement required Seaboard to immediately repay to SolarCity.

113. Defendants knew that SolarCity reasonably expected that those monies and SolarCity's solar equipment were to be used to fulfill obligations under the Installation Agreement and not to confer some unearned benefit on any Defendant or any Defendant's agents, affiliates, assigns, or principals, or on Does 1 or 2, including after SolarCity terminated Seaboard's obligations to perform the Work.

114. SolarCity has been damaged by Defendants' acts and should be compensated to the extent of the unearned benefits conferred.

**COUNT VI**
**Conversion -- All Defendants**

115.  SolarCity incorporates here by reference all prior paragraphs of the Complaint.

116.  By and through its conduct described above, all Defendants have intentionally and wrongfully exercised dominion and control over monies and equipment (including solar panels, inverters, and/or racking) that is now, and was at the time of Defendants' misconduct, property belonging to SolarCity.

117.  Defendants' exercise of dominion over SolarCity's property is without right because Defendants are not authorized to take and keep such property except pursuant to the terms of the Installation Agreement and are required to return such property to SolarCity upon demand.

118.  Defendants' actions resulted in the appropriation and retention by Defendants of SolarCity's property, thereby depriving SolarCity, the rightful owner, of the exclusive use of that property.  As such, Defendants wrongfully converted to their own use SolarCity's property.

119.  Defendants' actions in keeping the monies and equipment after demand by SolarCity and after termination of the Installation Agreement are and were intentional and wrongful.

120.  As a direct and proximate result of Seaboard's conversion of SolarCity's property, SolarCity has suffered damages and harm, including in its efforts to complete the Work.

**COUNT VII**
**Unfair and Deceptive Trade Practices (M.G.L. ch. 93A §§2, 11)**
**– Seaboard and Longman**

121.  SolarCity incorporates here by reference all prior paragraphs of the Complaint.

122.  At all times relevant to this action, SolarCity and Seaboard and Longman have been engaged in business or commerce as those terms are defined in G.L. c. 93A. §§2 and 11.

123. Upon information and belief, Seaboard and Longman engaged in unfair trade practices, including by failing to disclose and concealing other litigation and proceedings against Longman and other Longman entities, by taking and keeping monies and equipment (including solar panels, inverters, and/or racking) that is the property of SolarCity and by failing to use

those monies and equipment for performance of the Work before Seaboard was terminated, and, after its termination, by failing to return monies and equipment to SolarCity under the Installation Agreement.

124. Seaboard's actions were and continue to be knowing and willful violations and constitute unfair and deceptive competition and trade practices.

125. The unfair and deceptive competition and trade practices occurred primarily and substantially in Massachusetts.

126. Seaboard's conduct has caused and is continuing to cause SolarCity damages and other harm.

127. In addition, Seaboard has caused SolarCity to suffer a loss of money and/or property as a result of the violations of M.G.L. ch. 93A.

**COUNT VIII**
**Declaratory Judgment**

128. SolarCity incorporates here by reference all prior paragraphs of the Complaint.

129. By the actions described above, Seaboard has materially breached the Installation Agreement.

130. Certain of Seaboard's breaches prompted SolarCity to exercise its right to terminate the Installation Agreement and take over responsibility for completion of the Work.

131. When SolarCity terminated Seaboard's performance of the Work under the Installation Agreement, SolarCity requested that Seaboard immediately assign all subcontracts, provide necessary documents, and otherwise cooperate with SolarCity's taking over the Work, as required in §5.10 of the Installation Agreement.

132. Seaboard has failed to fulfill its contractual obligations, including by, but not limited to, the following: (1) failing to fulfill its contractual obligations regarding the completion of the seven solar projects according to the Schedule and terms of the Installation Agreement; (2) failing to assign to SolarCity all of Seaboard's subcontracts, purchase orders, permits, and authorizations that SolarCity requested or to deliver and make available information, drawings,

specifications documents, or patents reasonably necessary to complete the Work, (3) failing to turn over all monies and equipment (including solar panels, inverters, and/or racking); and (4) failing to repay SolarCity for the mechanic's lien that it has paid in an amount exceeding $205,525.  Seaboard's actions and failures to act have caused, and will continue to cause, damages and other harm to SolarCity.

133.  Based on the foregoing, an actual and present controversy exists between SolarCity and Seaboard regarding their respective rights under the Installation Agreement that requires declaratory relief.

### PRAYER FOR RELIEF

WHEREFORE, SolarCity respectfully requests that this Court:

A.      Enter an award against Seaboard and Longman and in SolarCity's favor for damages incurred as a result of Seaboard's breach of the Installation Agreement, including repayment of the $205,525.58 mechanic's lien;

B.      Enter an award against Seaboard for specific performance of its obligations under the Installation Agreement upon termination of the contract, including those listed in Exhibit 6, Section 5.10 and the following:   (1) to assign to SolarCity any and all of Seaboard's subcontracts, purchase orders, leases, and permits as SolarCity requests; and (2) to deliver to SolarCity any and all information, drawings, specifications documents, patents and licenses related to the Work or reasonably necessary for the completion of the Work;

C.      Enter an award against Seaboard of actual damages, trebled, for Seaboard's and Longman's violation of Chapter 93A, §§2 and 11 of the Massachusetts General Laws, together with SolarCity's attorneys' fees;

D.      Award SolarCity its reasonable costs and actual attorneys' fees incurred in this action;

E.      Award SolarCity interest and costs as allowed by law;

F.      Declare and order that Defendants and their agents, servants, employees, successors and assigns immediately return to SolarCity all monies not earned or expended under the Installation Agreement and immediately return all SolarCity-provided supplies and solar equipment;

G.      Declare and order that Defendants provide an immediate accounting of what they did with all the money and equipment they received from SolarCity under the Installation Agreement as well as of all supplies and equipment received or procured in connection with the Installation Agreement that were not installed on any Site;

H.      Order that Defendants not convert, dissipate, alienate, lose, or do anything, directly or indirectly, that will result in the conversion, dissipation, alienation, or loss of any monies, equipment, supplies, or other things of value obtained or procured in any way in connection with the Installation Agreement, including, but not limited to, money and solar equipment received from SolarCity;

I.      Order that Seaboard not interfere in any manner with SolarCity's efforts to complete the Work on the Projects;

J.      Declare that SolarCity is the owner of all interests in each of the seven Sites and that Defendants have no further right or interest in them; and

K.      Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues and claims so triable.

Dated:  September 30, 2015                    Respectfully submitted,

                                             **SOLARCITY CORPORATION,**

                                             By its attorneys,


                                             /s/ *Andrew C. Phelan*
                                             Andrew C. Phelan (# 643160)
                                             Elizabeth M.  Sartori  (# 672577)
                                             **MORGAN, LEWIS & BOCKIUS LLP**
                                             One Federal Street
                                             Boston, Massachusetts 02110
                                             (617) 951-8000
                                             andrew.phelan@morganlewis.com
                                             elizabeth.sartori@morganlewis.com


## <u>CERTIFICATE OF SERVICE</u>

I, Andrew C. Phelan, hereby certify that this document filed through the ECF system on

September 30, 2015 will be sent electronically to the registered participants as identified on the

Notice of Electronic Filing (NEF) and paper copies will be served on Seaboard Solar Operations,

LLC and Stuart Longman at the addresses listed below:

Seaboard Solar Operations, LLC
c/o Mark Stern, Esq.
Mark Stern & Associates, LLC
16 River Street -- Second Floor South
Norwalk, CT 06852

Stuart Longman
424 West Mountain Road
Ridgefield, CT 06877


                                             /s/ *Andrew C. Phelan*